| | |
|---|---|
| CARRIE BOGGESS,              ) | |
|              ) | |
|      Plaintiff,       ) | |
|              ) | |
|      vs.           ) | __MEMORANDUM AND ORDER__ |

**CARRIE BOGGESS,**      )

         **Plaintiff,**      )

         **vs.**         )        __MEMORANDUM AND ORDER__

**JEFF ROPER, individually and in his**
**official capacity as Program Manager,**
**Operations Manager, Co-Host of "The**
**Jeff Roper Show," WSOC Radio Station,**
**FM 103.7, INFINITY RADIO INC., d/b/a**
**INFINITY BROADCAST CO., VIACOM,**
**and CBS RADIO,**

         **Defendants.**

**THIS MATTER** is before the Court on the motions of the defendants for summary judgment (Doc. No. 21: Motion by CBS Radio and Viacom; Doc. No. 60: Motion by CBS Radio, Viacom, Infinity Radio, WSOC Radio Station, and Jeff Roper; Doc. No. 86: Renewed Motion following Amended Complaint), and the associated responses, replies, memoranda and appendices. For the reasons stated below, the Court **GRANTS** in part and **DENIES** in part the defendants' motions for summary judgment.

## I.    INTRODUCTION

Carrie Boggess brought this action asserting eighteen state law claims, including sexual harassment, breach of contract, intentional and negligent infliction of emotional distress, interference with contract, conversion, assault, and negligent retention and supervision. (Doc. No. 81: Amended Complaint). The defendants removed the case from state court based on the diversity of the parties, pursuant to 28 U.S.C. § 1332. (Doc. No. 1: Notice of Removal).

In or about May 2002, Boggess, then twenty-two years old, approached Country Music Award-winning radio personality Jeff Roper at an Alan Jackson concert. She later phoned Roper hoping she and her boyfriend could be invited to a meet-and-greet opportunity with Kenny Chesney. He agreed and put her on an invitee list at WSOC radio station where he was the host of "The Jeff Roper Show," which was broadcast during the prime weekday morning hours. While at the station, Boggess spoke to Richard Palmer, a/k/a Richie Rich, the show's producer, about how she could get into radio. Palmer told her to seek an intern position on a morning show. Coincidentally, the current intern for the show was leaving her position. Boggess, without applying or being interviewed, was selected by Roper to replace her.

After Boggess worked four months as an unpaid intern for the show, Roper hired her as an on-air personality, although the high school graduate had no previous broadcast experience. She understood her role to be a "sidekick" and helper on the show. Roper was not pleased with her performance, and coached her on how to improve her reading and communication skills. The radio station also provided consultants to work with Boggess on how to target additional women listeners. Boggess alleges that Roper reacted to her with verbal abuse, intimidation, and humiliation that resulted in her leaving the radio station in February 2004 suffering from post-traumatic stress disorder.

Prior to leaving the show, Boggess approached Human Resources Director Barbara McIntyre in October 2003 with an unspecified problem, but McIntyre was not able to deal with her at that time. On January 28, 2004, Boggess met with McIntyre and complained about Roper's yelling at her for turning on the heat in the studio and slapping her hand away from the

thermostat.[1]  McIntyre followed up the conversation with an email thanking Boggess for coming

forward, promising to address the situation with Roper when he returned the following week,

and assuring her of the company's no-retaliation policy.  McIntyre and Vice-President and

General Manager Bill Schoening met with Roper about the incident.  On February 3, 2004,

Roper requested by email a meeting with Boggess that day.  She, however, left for a doctor's

appointment and never returned to work.  McIntyre tried to reach Boggess at home to investigate

her report, but Boggess said she would not provide any further information.  The Complaint in

this matter was filed on February 5, 2004.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).  The movant has the "initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party.  The

nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."

Id.  The nonmoving party may not rely upon mere allegations or denials of allegations in her

pleadings to defeat a motion for summary judgment.  Id.  Evidence that is not supported is

---

[1] In between these dates, Boggess and McIntyre exchanged emails, but Boggess never mentioned
a problem with Roper.

insufficient to defeat a motion for summary judgment. <u>Id.</u> at 323-24.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> <u>also</u> <u>Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).  When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255.  However, "a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Id.</u> at 252.

**III.    DISCUSSION**

A.    All Claims as to CBS Radio

Boggess named CBS Radio as a defendant in this case. (Doc. No. 81: Amended Complaint at ¶ 5).  CBS Radio has shown that it changed its name to Infinity Radio, Inc. in 2000 and ceased to exist as a legal entity. (Doc. No. 21: Motion at 4, Exhibit C).  Boggess has not produced any evidence creating a genuine issue of material fact about CBS Radio's non-existence at the time she was hired at WSOC in 2002.  Therefore, CBS Radio is entitled to summary judgment upon all of Boggess's claims.

B.    All Claims as to Viacom

Boggess also named Viacom as a defendant as an owner, operator, and manager of Infinity Broadcast Company. (Doc. No. 81: Amended Complaint at ¶ 5).  Viacom admits that Infinity Radio Holdings, Inc., which holds the FCC license and assets of WSOC, is a wholly-owned subsidiary of Infinity Radio Inc., which is a wholly-owned subsidiary of Infinity Media

Corp., which is a wholly-owned subsidiary of Infinity Broadcasting Corp., which is a wholly-owned subsidiary of Viacom. (Doc. No. 21: Motion at 4, Exhibit C). However, Viacom denies that it is liable for the acts of its subsidiary.

A corporate parent cannot be held liable for the acts of a subsidiary unless the corporate structure is a sham, and the subsidiary is nothing but an instrumentality of the parent organization. Broussard v. Meineke Discount Muffler Shops, 155 F.3d 331, 349 (4th Cir. 1998). To prove that a subsidiary is a mere instrumentality of its corporate parent, a plaintiff must prove:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained.

East Market Street Square, Inc., v. Tycorp Pizza IV, Inc., 625 S.E.2d 191, 196 (N.C. Ct. App. 2006) (citing Glenn v. Wagner, 329 S.E.2d 326, 330 (N.C. 1985)).

Here, in light most favorable to Boggess, the only evidence of Viacom's involvement in this matter is a Viacom Business Conduct Statement that states policies and rules applicable to all employees. Although the plaintiff alleges that she relied on this statement in accepting this employment as a promise of an harassment-free workplace (Doc. No. 98: Memorandum at 18-

26), Boggess admitted in her deposition that she had no memory of ever seeing that document (Doc. No. 61: Appendix at B, Boggess TR 128-9). Additionally, Boggess has provided no evidence establishing a genuine issue of material fact on the elements detailed above required to prove that Infinity Radio Holdings, Inc. was a mere instrumentality of Viacom. Therefore, Viacom is entitled to summary judgment upon all of the plaintiff's claims.

C.      Breach of Contract Claim

In her First Cause of Action, Boggess claims that Roper violated his duty "not to impeded [sic] or hinder Plaintiff's right to fully perform under her employment contract" through "mental torment, unreasonable restrictions, and physical contact." (Doc. No. 81: Amended Complaint at ¶¶ 20-21). Although Boggess has provided no authority for her argument that such would make the defendants liable for breach of contract, courts have addressed situations where one party completely prevents performance by the other.

In Tillis v. Calvine Cotton Mills, Inc., 111 S.E.2d 606, 609 (N.C. 1959), the parties contracted for Tillis to transport material for Clavine in a truck provided by Clavine. When Tillis arrived to haul the goods, Clavine repudiated the contract, refused to allow Tillis to perform under the contract, and repossessed the truck. Id. The court held that where one party renounces a contract calling for future performance, the other party may treat the renunciation as a breach and sue for damages at once. Id. at 610. The measure of damages was what Tillis would have earned had he been allowed to haul the goods. Id. at 612-13. In Hayman v. Davis, 109 S.E. 554, 555 (N.C. 1921), Davis agreed to give his daughter, Hayman, a tract of land at his

6

death in exchange for her taking care of him until then. After 22 years during which she became partially disabled from the difficulties working in the house and field, her father left her and did not allow her to care for him anymore. Id. at 555. The Court found that Davis was liable for the value of the services Hayman provided before he made her further performance of the contract impossible. Id.

Here, Boggess alleges that Roper's harassment prevented her full performance under the contract. She claimed and received disability payments based on "situational stress" and "Post-Traumatic Stress Disorder, the result of the verbal abuse, intimidation, and humiliation she experienced at her place of employment." (Doc. No. 98: Memorandum, Exhibits 3 and 4). Even if Roper intentionally caused a disability to frustrate Boggess's performance, she had a contractual duty "to cooperate fully" with WSOC to determine whether such disability affected her ability to function as an employee and whether a reasonable accommodation could be made. (Doc. No. 98: Memorandum, Exhibit 19 at 6). Yet, as detailed above, after Boggess informed WSOC in late January 2004 of one instance of alleged mistreatment by Roper, she refused to provide any additional information, and never returned to work. Additionally, she did not seek another position at the radio station. (Doc. No. 61: Appendix at B, Boggess TR 421).

Although Boggess testified that she would not work in proximity to Roper again (Doc. No. 61: Appendix at B, Boggess TR 412), another employee, Willa Sexton, a/k/a Katherine Lane, was allowed to be supervised by someone else after she complained about a written reprimand Roper placed in her employment file (Doc. No. 98: Memorandum at Exhibit 7, Sexton

TR 9; Doc. No. 61: Appendix at G, McIntyre TR 46). Thus, Boggess cannot claim that Roper is responsible for her failure to perform under the contract by cooperating with WSOC to seek an accommodation, and to return to work in some capacity after the six-month maximum disability period ended. Therefore, summary judgment is granted on her First Cause of Action claiming breach of contract.

      D.      Tortious Interference with Contract

      Boggess also asserts in her Second Cause of Action that Roper tortiously interfered with her performance under the contract by his alleged harassment. The elements of such a claim are:

> (1) a valid contract between the plaintiff and a third person;
> (2) defendant knows of the contract; (3) the defendant intentionally induces the
> third person not to perform the contract; (4) and in doing so acts without
> justification; (5) resulting in actual damage to the plaintiff.

Embree Construction Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 924 (N.C. 1992). In her Complaint, Boggess alleges that she was employed by Roper and that she directly reported to him. (Doc. No. 81: Amended Complaint at ¶ 24). An interference with contract claim may not be brought against a party to the contract, nor may it be brought against a party who has a legitimate interest in the performance of a plaintiff. Wagoner v. Elkin City School's Bd. of Ed., 440 S.E.2d 119, 124-25 (N.C. Ct. App. 1994) (teacher could not maintain action against principal). Therefore, summary judgment in favor of the parties to the contract, Infinity Radio Holdings, Inc. and WSOC, and Boggess's direct supervisor, Roper, is required.

      Even if the Court were to consider the merits of her claim, Boggess at a minimum would be required to prove that Roper intentionally induced WSOC to terminate her employment, or, in

the theory of her Complaint, that Roper intentionally prevented Boggess from performing under the contract so that WSOC would terminate her. Taking the evidence in a light most favorable to the plaintiff, there is a complete failure of proof showing that Roper intended for the contract to be breached. In her Memorandum in Opposition to Defendants' Motion for Summary Judgment, Boggess states that "according to the allegations of the complaint, the actions of the defendant, Roper were intentionally done for an unlawful purpose." (Doc. No. 98: Memorandum at 30). Her reliance on the allegations in her complaint is insufficient to defeat summary judgment. Celotex, 477 U.S. at 323. The proof shows that Roper took steps to help Boggess grow professionally (Doc. No. 61: Appendix at A, Roper TR 29-37), but she never felt the need to improve (Doc. No. 61: Appendix at B, Boggess TR 88). There is no evidence from which a reasonable jury could conclude that Roper was abusive to force Boggess out of her job. Therefore, summary judgment is granted on her Second Cause of Action claiming tortious interference with contract.

E. Sexual Harassment Claims

Boggess has raised three state law claims relating to sexual harassment.[2] In her Third Cause of Action, she claims a violation of her equal protection rights under the North Carolina Constitution by Roper's comments and actions as based on gender. (Doc. No. 81: Amended Complaint at ¶ ¶ 29-35). Her Fifteenth Cause of Action alleges a civil rights violation of the North Carolina Constitution for discrimination by being placed in a disadvantaged position to

[2]None of Boggess's sexual harassment claims were brought under federal law.

maintain gainful employment because of her gender. (Doc. No. 81: Amended Complaint at ¶¶ 96-101). And her Seventeenth Cause of Action claims Boggess was disadvantaged by pointing to the totality of the circumstances as establishing a hostile work environment, although she does not state what law was broken. (Doc. No. 81: Amended Complaint at ¶¶ 108-111).

Boggess argues that all her claims may be brought under the North Carolina Constitution which has a public policy against hostile work environments. (Doc. No. 98: Memorandum at 17, 26). Boggess testified that Roper never made sexual advances towards her, never requested sexual favors from her, and never touched her in a sexual manner. (Doc. No. 61: Appendix at B, Boggess TR 131-134). Rather, she claims that as a woman she was subjected to abuse by Roper to which male employees were not. (Doc. No. 61: Appendix at B, Boggess TR 210, 422, 489-90). Therefore, the Court will consider all three causes of action as hostile work environment claims brought under the North Carolina Constitution.

The defendants assert that Boggess may not proceed against them under the North Carolina Constitution because they are not state actors. (Doc. No. 60: Memorandum at 12-13). Indeed, in Corum v. University of North Carolina, 413 S.E.2d 276, 293 (N.C. 1992), the North Carolina Supreme Court held that "The [North Carolina] Constitution is intended to protect our rights as individuals from our actions as governments. The Constitution is not intended to protect our rights vis-a-vis other individuals." Thus, the court found that a professor could pursue money damages against university executives in their official capacities as state actors, but not in their individual capacities. Id. at 290, 292.

Boggess attempts to distinguish her case by relying on a footnote in Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995), for the proposition that a plaintiff may pursue an action directly under the North Carolina Constitution in the absence of a state remedy. (Doc. No. 98: Memorandum at 17-18). The Court is unpersuaded. First, Boggess has failed to show the absence of a state remedy which would trigger direct action under the state constitution. Second, the court's statement in Hughes is followed by a citation to the portion of Corum dealing with suits against state actors. Hughes, 48 F.3d at 1383 n.6 (citing Corum, 413 S.E.2d at 289). Because Hughes also dealt with a suit against state actors (county sheriff's department employees), its statement has no bearing on this suit against private parties. Therefore, summary judgment must be granted on Boggess's Third, Fifteenth, and Seventeenth Causes of Action seeking monetary damages under the North Carolina Constitution from non-state actors.

Boggess's prayer for injunctive relief at the end of the Complaint does not save this claim. (Doc. No. 81: Amended Complaint at 22; Doc. No. 98: Memorandum at 17-18). First, Boggess has provided no authority for her argument that claims for injunctive relief may be brought under the state constitution even if claims for monetary damages may not. Second, even in a light most favorable to Boggess, she cannot show she was terminated because of a hostile work environment. She was terminated on August 24, 2004, pursuant to the terms in her contract, when she failed to return to work after a six-month leave of absence, and she was encouraged to re-apply for employment when she was physically and mentally able to return to work. (Doc. No. 61: Appendix at F). As noted above, Boggess testified that no one told her not

to return to work, and there is no evidence that she ever sought to keep her employment with WSOC.  Therefore, her claim for injunctive relief, even if allowable under the North Carolina Constitution, is without merit.

      F.      Intentional Infliction of Emotional Distress Claim

      In her Fourth Cause of Action, Boggess claims that Roper's "display of physical aggression" was extreme and outrageous and caused her to suffer a medical disability and extreme emotional distress. (Doc. No. 81: Amended Complaint at ¶¶ 37, 40).  She argues that Roper engaged in "demonic torture meant to rip away all auspices of [her] human dignity" by clapping his hands and snapping his fingers near her face; yelling; throwing headphones and a chair; banging his hand; slapping her hand away from a thermostat; and making disparaging remarks, some of which were sexual. (Doc. No. 98: Memorandum at 36-38).

      The elements of an intentional infliction of emotional distress (IIED) claim are: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause, (3) severe emotional distress to another." Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C. 1981).  An IIED claim also may be satisfied where a defendant's actions indicate a reckless indifference to the probability that they will cause severe emotional distress.  Id.  Whether the conduct alleged was intentional, and was extreme and outrageous enough to support an IIED claim are questions of law for the Court. Guthrie v. Conroy, 567 S.E.2d 403, 408 (N.C. Ct. App. 2002).

      "A claim for intentional infliction of emotional distress exists when a defendant's conduct exceeds all bounds usually tolerated by decent society." Id. (internal quotations and

citations omitted).  North Carolina courts have recognized that "non-consensual sexual touchings, constant suggestive remarks and on-going sexual harassment" exceed the bounds tolerated by society, <u>Hogan v. Forsyth Country Club Co.</u>, 340 S.E.2d 116, 121 (N.C. Ct. App. 1986), but that sexually harassing behavior must be more than "mere insults, indignities, and threats," <u>Guthrie</u>, 567 S.E.2d at 409.  The court in <u>Guthrie</u> analyzed the types of allegations that have resulted in valid IIED claims, including:

> an unfair power relationship between defendant and plaintiff; explicitly obscene or "X rated" language; sexual advances towards plaintiff; statements expressing desire to engage in sexual relations with plaintiff, or; [sic] defendant either touching plaintiff's private areas or touching any part of the plaintiff's body with his private parts.

<u>Id.</u>  Where acts do not amount to such overtly sexual conduct, "plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate or unkind." <u>Id.</u> (quoting <u>Hogan</u>, 340 S.E.2d at 123).

In the instant case, the plaintiff testified that Roper never made sexual advances towards her, never requested sexual favors from her, and never touched her in a sexual manner. (Doc. No. 61: Appendix at B, Boggess TR 131-134).  She complains that on one occasion Roper told her to get her "fat ass" up off a stool, that he said every woman he works with goes crazy, and that she should dress up and look pretty like Jennifer Lopez. (Doc. No. 98: Memorandum at 37). Boggess admitted the context of Roper's alleged "fat ass" comment was immediately following a conversation they had about losing weight, and that Roper never made another similar statement after she confronted him about it. (Doc. No. 61: Appendix at B, Boggess TR 131-134).

The statement about women going crazy was part of a planned on-air skit.[3] (Doc. No. 61: Appendix at B, Boggess TR 212; Appendix at C, Palmer Aff. at ¶ 14). The comment about dressing up preceded their appearance at the Country Music Association Awards Show, for which Roper expected both male and female WSOC attendees to dress formally.[4] (Doc. No. 61: Appendix at B, Boggess TR 278; at C, Palmer Aff. at ¶ 15). Thus, in a light most favorable to Boggess, these isolated comments fall well short of establishing extreme and outrageous sexual harassment.

Regarding non-sexual misconduct, the North Carolina Court of Appeals held:

There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam . . .

Hogan, 340 S.E.2d at 123 (quoting Restatement (Second) of Torts, § 46 comment (d) (1965)). Thus, the court found that a chef's screaming, shouting, and calling a waitress names; interfering with her supervisory position; and throwing menus at her did not exceed societal boundaries. Id. Likewise, the court found a police captain did not engage in extreme conduct when he yelled at a female officer; slammed his hands on a desk; slammed his chair against a wall; told that her tests would be easy enough for a woman; evaluated her weekly, but not other probationary

[3] See e.g. Lyle v. Warner Bros. Television Productions, 132 P.3d 211 (Cal. 2006) (comedy writer's assistant failed to establish sexual harassment for offensive gender-based comments arising from creative process for television show Friends.)

[4] Roper also allegedly told Boggess to dress up for a television appearance, for which he also dressed better than he did for radio broadcasts. (Doc. No. 61: Appendix at B, Boggess TR 239-242).

employees; and refused to shake her hand when he met new officers. <u>Bendross v. Town of Huntersville</u>, 582 S.E.2d 726, 2003 WL 216493354, at *4-5 (N.C. Ct. App. 2003)(unpublished).

Here, the complained of misconduct allegedly committed by Roper has been found not to constitute actionable behavior by North Carolina courts. Boggess argues that the totality of the incidents over a sixteen month period exceeded the point of being extreme and outrageous.[5] (Doc. No. 98: Memorandum at 40). The court in <u>Wagoner v. Elkin City School's Bd. of Ed.</u>, 440 S.E.2d 119, 123-24 (N.C. Ct. App. 1994), however, found a principal's conduct not extreme where over a five-year period he forced a teacher to work away from other faculty in a small, hot, and humid room; refused to allow her to attend training opportunities; assigned her after hours and weekend schedules supervising in-school suspension students; told her she had the worst job in the school; and embarrassed her in front of the entire faculty. The time period in the instant case is much shorter. Although Boggess may have felt insulted and suffered indignities from inconsiderate and unkind acts, Roper's alleged conduct, although boorish, was not extreme and outrageous. Therefore, summary judgment is granted on her Fourth Cause of Action claiming intentional infliction of emotional distress.

G. Negligent Infliction of Emotional Distress Claim

In her Fifth Cause of Action, Boggess claims that Roper's alleged misconduct resulted in negligent infliction of emotional distress. (Doc. No. 81: Amended Complaint at ¶¶ 42-45). The defendants respond correctly that negligence actions against employers and co-employees are

---

[5]Boggess's estimation of at least 477 alleged incidents of Roper's misconduct factored extrapolations of certain acts being committed on an average basis over the entire duration of her tenure as an on-air personality. (Doc. No. 103: Notice of Clarification of Method Which Plaintiff Calculated Incidents).

barred by North Carolina's Workers' Compensation Act (WCA). (Doc. No. 60: Memorandum at 30). Boggess has not responded to this argument, but has insisted on the merits of her claim. (Doc. No. 98: Memorandum at 43-45).

1. Claims Barred by Workers' Compensation Act ("WCA")

In <u>Pleasant v. Johnson</u>, 325 S.E.2d 244, 246-47 (N.C. 1985), the North Carolina Supreme Court traced the origins of workers' compensation and detailed the limits of the state's WCA. The court stated that provisions of the Act "bar a worker from maintaining a common law negligence action against his employer" and "from suing a co-worker whose negligence caused the injury."[6] <u>Id.</u> at 247. Emotional injuries, such as depression and other mental conditions, are compensable under the Act where they arise out of and in the course of employment. <u>Jordan v. Central Piedmont Community College</u>, 476 S.E.2d 410, 412-14 (N.C. Ct. App. 1996). The test for whether an injury "arises out of" employment is whether the injury is a natural and probable consequence of the nature of the employment, such that a reasonable person familiar with the whole situation would contemplate the risk of injury. <u>Caple v. Bullard Restaurants, Inc.</u>, 567 S.E.2d 828, 832 (N.C. Ct. App. 2002).

Because such injuries are compensable under the WCA, courts have barred plaintiffs from claiming negligent infliction of emotional distress when they suffer work-related emotional injuries. For example, in <u>Caple</u>, a restaurant manager was precluded from suing the owner for emotional injuries after she was assaulted and robbed by a co-worker because the risk of being

_____

[6]However, the WCA does not bar suits against employers or co-employees for intentional torts. <u>Id.</u>

robbed was incidental to working as night manager. Id. at 833-34. The North Carolina Court of Appeals found that this rule did not apply to negligence actions based on sexual harassment in Hogan v. Forsyth Country Club Co., 340 S.E.2d 116, 124 (N.C. Ct. App. 2002). The court reasoned that sexual harassment is not a risk incident to employment because an employee "could be equally exposed outside the employment." Id. (citing Gallimore v. Marilyn's Shoes, 233 S.E.2d 529 (N.C. 1977) (robbery, abduction, and murder of employee not compensable under WCA where there was no proof that assailant knew the employee carried money for her employer)). In Caple, 567 S.E.2d at 834, the court rejected the plaintiff's attempt to generalize Hogan as allowing claims for all negligent hirings that result in emotional injury, and contained Hogan's application to injury related to sexual harassment.

Here, Boggess has asserted that her emotional injuries resulted from her employment. She supported her claim for disability payments with a letter from her treating psychological associate, Ruth Kappias, stating, "Carrie Boggess is in treatment with me for Post-Traumatic Stress Disorder, the result of the verbal abuse, intimidation, and humiliation she experienced at her place of employment." (Doc. No. 98: Memorandum, Exhibit 4). Her Surreply contains testimony from Kappias that "[t]he post traumatic stress appears to have been caused by her experiences at the radio station with her boss." (Doc. No. 107: Surreply at 7). Boggess is bound by those admissions. Caple, 567 S.E.2d at 831. Therefore, Boggess's alleged emotional injuries arose from and were in the course of her employment and her claims based on conduct other than sexual harassment are barred by the WCA.

2. Claims Not Barred by WCA

Because a plaintiff may raise negligence claims for injuries caused by sexual harassment under Hogan, the Court will consider the merits of Boggess's allegations of sexual harassment incorporated into her NIED claim. The elements of such a claim are:

> (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress ···, and (3) the conduct did in fact cause the plaintiff severe emotional distress.

Smith-Price v. Charter Behavioral Health Systems, 595 S.E.2d 778, 782 (N.C. Ct. App. 2004) (quoting Johnson v. Ruark Obstetrics, 395 S.E.2d 85, 97 (N.C. 1990) (internal quotations omitted).

Assuming that Roper negligently engaged in sexually harassing conduct, the evidence in a light most favorable to Boggess does not establish that it was reasonably foreseeable that such conduct would cause her severe emotional distress. Of the complaints made to WSOC Human Resources Director Barbara McIntyre by employees regarding Roper, none alleged sexual harassment. (Doc. No. 61: Appendix at G, McIntyre TR 30-50; Doc. No. 98: Memorandum, Exhibit 7, Sexton TR 9; Exhibit 11, Hatfield Affidavit at ¶ 4; Exhibit 13, Bateman TR 40; Exhibit 14, Boozer Affidavit at ¶ 4; Exhibit 15, Luke Jensen Memo). Likewise, Boggess never reported any allegations of sexual harassment. (Doc. No. 61: Appendix at B, Boggess TR 238-39; Appendix at G, McIntyre TR 50-52). As detailed above, after she confronted Roper about the "fat ass" comment, he never made another similar remark. Additionally, his comment about women going crazy was not directed at Boggess, but was part of an on-air skit. Finally, Roper

directed men and women to dress up for the CMA Awards, and it was reasonable for Roper to advise Boggess to dress up for a television appearance. Therefore, it was not reasonably foreseeable to Roper or his employers that his alleged sexual harassment would cause Boggess severe emotional distress, and summary judgment is granted on her Fifth Cause of Action claiming negligent infliction of emotional distress.

H.     Tortious Interference with Business Relations Claim

In her Sixth Cause of Action, Boggess claims that Roper deliberately prevented her from pursuing broadcast opportunities. (Doc. No. 81: Amended Complaint at ¶¶ 47-51). She argues that Roper was not justified in refusing to allow her to appear as a guest host on a local television show called Fox News Edge. (Doc. No. 98: Memorandum at 32-34). To establish a claim of tortious interference with prospective advantage, a plaintiff must show that a defendant induced a third party to refrain from entering into a contract with the plaintiff without justification, that the contract would have ensued but for the defendant's interference, and that the defendant had no motive other than malice. Beck v. City of Durham, 573 S.E.2d 183, 191 (N.C. Ct. App. 2002).

Boggess was contractually obligated to work exclusively for WSOC, unless her employer consented to her performing services for another company. (Doc. No. 98: Memorandum, Exhibit 19 at 8). Under New York law, which governs interpretation of her contract, an employee must exercise the utmost good faith and loyalty during her employment and not seek to acquire indirect advantages from third persons for performing duties owed to her employer. Western

Electric Co. v. Brenner, 360 N.E.2d 1091, 1094 (N.Y. 1977). Her complaint that she was denied the personal advantage of pursuing a broadcast opportunity with another media outlet is contradicted by her agreement with WSOC.

Additionally, in a light most favorable to Boggess, there is no proof that Roper was motivated only by malice when he prevented her from appearing on the television show in December 2002. Boggess asserts, without any factual support, that his denial was "founded in envy and jealousy" because Roper had once been fired from a television show in another city and state. (Doc. No. 98: Memorandum at 33). This unfounded allegation is insufficient to defeat summary judgment. Celotex, 477 U.S. at 323.

Finally, there is evidence of Roper's motivations other than malice which justify his denial of her request to appear on Fox News Edge. With no previous broadcast experience, Boggess began to appear as an on-air personality on the Jeff Roper Show in September 2002. (Doc. No. 61: Appendix at B, Boggess TR 50). When she was asked to host Fox News Edge just three months later, she had no training or experience hosting a live television show. (Doc. No. 61: Appendix at B, Boggess TR 325-26). Thus, Roper, who had experience with live television, was justified in telling Boggess that she was not ready to handle that type of appearance and that they needed to do the show as a team. (Doc. No. 61: Appendix at B, Boggess TR 316, 326-28). He later allowed her to appear on the show when they hosted it together in the fall of 2003. (Doc. No. 61: Appendix at B, Boggess TR 323).

Boggess has failed to establish that she had a right to pursue an independent opportunity with Fox News Edge, and that Roper's denial was without justification and based only on malice. Therefore, summary judgment is granted on her Sixth Cause of Action claiming tortious interference with business relations.

I. Negligence Claims

In her Seventh Cause of Action, Boggess claims that the defendants failed in their duty to respond to "threats, physical outbursts, and apparent verbal threats and offensive comments in the course of business." (Doc. No. 81: Amended Complaint at ¶¶ 53-57). In her Sixteenth Cause of Action, she claims that the defendants negligently retained and supervised Roper. (Doc. No. 81: Amended Complaint at ¶¶ 102-107). Boggess relies on Hogan in response to the defendants' motion for summary judgment. (Doc. No. 98: Memorandum at 48-49). However, as discussed above, the court in Hogan, 340 S.E.2d at 124, held that the WCA bars negligence actions against employers for injuries caused by conduct other than sexual harassment. The court in Caple, 567 S.E.2d at 833-34, clarified that Hogan did not remove the WCA's bar on negligent hiring claims for injuries resulting from other work-related causes.

Thus, Boggess's negligence claims against the corporate defendants based on their alleged failure in hiring, retaining, supervising, and responding to Roper must be dismissed. Interpreting her "offensive comments" allegation to include the asserted sexually harassing comments detailed above, the Court finds that no reasonable jury could find those isolated comments to be the proximate cause of her claimed emotional injuries, or that the corporate defendants knew or had reason to know that Roper might engage in sexual harassment.

Therefore, because her claims of negligence and negligent retention are barred by the WCA and fail on their merits, summary judgment is granted her Seventh and Sixteenth Causes of Action.

       J.       Fraud and Misrepresentation Claims

In her Eighth Cause of Action, Boggess claims that Roper committed fraud by telling her that she "would secure equal footing on the morning talk show." (Doc. No. 81: Amended Complaint at ¶¶ 58-63).  Her Twelfth Cause of Action is based on a claim that the defendant "made statements to induce Plaintiff to think that there would be a professional, business relationship free from hostility, fear and intimidation." (Doc. No. 81: Amended Complaint at ¶¶ 82).  Her claim for negligent misrepresentation stated in her Thirteenth Cause of Action is based on that allegation plus the corporate defendants' alleged failure to warn her of the hostile environment she was entering. (Doc. No. 81: Amended Complaint at ¶¶ 86-90).  Boggess restates these same allegations in her Fourteenth Cause of Action claiming misrepresentation. (Doc. No. 81: Amended Complaint at ¶¶ 91-95).

An essential element for each of these claims is that a plaintiff reasonably rely on a misrepresentation by a defendant. Myers and Chapman, Inc., v. Thomas G. Evans, Inc., 374 S.E.2d 385, 391 (N.C. 1988) (elements of fraud); Harton v. Harton, 344 S.E.2d 117, 119-120 (N.C. Ct. App. 1986) (elements of fraudulent inducement); Jordan v. Earthgrains Baking Co., Inc., 576 S.E.2d 336, 339 (N.C. Ct. App. 2003) (elements of negligent misrepresentation); Coley v. North Carolina Nat'l Bank, 254 S.E.2d 217, 219-220 (N.C. Ct. App. 1979) (elements of misrepresentation).  To support each of these claims, Boggess asserts that she relied on statements about her future business environment and her opportunity to secure equal footing as

co-host contained in the Viacom Business Conduct Statement and her employment contract. (Doc. No. 98: Memorandum at 18-25). Boggess's testimony confirms that neither document induced her to accept employment at WSOC. When presented with a copy of the Viacom Business Conduct Statement, she admitted that she had no memory of ever seeing that document. (Doc. No. 61: Appendix at B, Boggess TR 128-9). Similarly, she began her employment as an on-air personality a month before signing her contract. (Doc. No. 61: Appendix at B, Boggess TR 42-43). Therefore, Boggess has not established a genuine issue of fact that she actually relied on the Viacom Business Conduct Statement and her employment contract when accepting her employment.

Even if Boggess had relied on those documents, there is no proof that either contained fraudulent misrepresentations. An actionable fraudulent statement must be "a misrepresentation of a subsisting fact." American Laundry Machine Co. v. Skinner, 34 S.E.2d 190, 193 (N.C. 1945) (internal quotations and citations omitted). The Viacom Business Conduct Statement states a policy of maintaining an "harassment-free workplace," and details procedures for employees to follow when they are aware of conduct violating the policy. (Doc. No. 98: Memorandum, Exhibit 9 at 6). Thus, the Statement can not be interpreted as making the representation that the workplace will, in fact, be free of harassment when it details procedures for dealing with harassment that does occur. Her employment contract likewise does not promise a professional work environment, but subjects her to discipline for "failure to work in a harmonious manner with management or other employees." (Doc. No. 98: Memorandum,

Exhibit 19 at 6). Boggess admitted that her contact never used the term "co-host" to describe her position, and that she understood her role to be a "sidekick" or helper to Roper. (Doc. No. 61: Appendix at B, Boggess TR 55-57; 176-77). She has provided no proof of any other statements that would have reasonably caused her to believe she would secure "equal footing" on the show.[7] Therefore, she has failed to show a genuine issue of material fact of the defendants' alleged misrepresentations.

Boggess asserts that the defendants committed fraud and failed in their duty by not informing her about Roper's allegedly abusive and offensive nature. (Doc. No. 98, Memorandum at 22-23). An employer has a duty

> to warn his employees concerning dangers which are known to him or which in the exercise of reasonable care should be known to him, and are unknown to his employees or are undiscoverable by them in the exercise of due care, and concerning dangers which, by reason of youth, inexperience, or incompetency the employees do not appreciate.

Clark v. Roberts, 139 S.E.2d 593, 597-598 (N.C. 1965) (internal quotations and citations omitted). Here, Boggess admitted that she had actual notice of the "dangers" about which she now complains. Boggess worked in the studio during the daily radio show as an intern for four months before replacing Laura Bateman, a/k/a Laura Kay, as Roper's sidekick. (Doc. No. 61: Appendix at B, Boggess TR 29-31). She observed Roper get angry with Bateman for saying the wrong things, and clap his hands and snap his fingers in her face, after which Bateman would cry "a lot." (Doc. No. 61: Appendix at B, Boggess TR 75). Bateman told Boggess that Roper was

---

[7]The employment contract specifies that it contains the entire understanding of the parties. (Doc. No. 98: Memorandum, Exhibit 19 at 18).

very particular and very intimidating at times. (Doc. No. 61: Appendix at B, Boggess TR 76-77). Although she was "uncomfortable" with the way Roper treated Bateman, Boggess never reported the conduct and took her place when Bateman left the show. (Doc. No. 61: Appendix at B, Boggess TR 31, 75-76). The evidence shows that Boggess had actual notice of and could appreciate the conditions which she claims caused her injuries. Thus, the defendants were not obligated to warn her about Roper.

Therefore, summary judgment is granted on her Eighth, Twelfth, Thirteenth, and Fourteenth Causes of Action because there is no genuine issue of material fact that the defendants made any misrepresentations to Boggess or that she relied on any such statements in accepting her employment on the show.

K.    Conversion and Trespass Claims

In her Ninth Cause of Action, Boggess claims civil conversion for Roper's denial of her the use of airline tickets allotted for her business travel. (Doc. No. 81: Amended Complaint at ¶¶ 64-69). Her Tenth Cause of Action alleges a trespass to chattel by Roper which caused her to lose possession of airline tickets and to use "her personal cash to subsidize costs." (Doc. No. 81: Amended Complaint at ¶¶ 70-74). Boggess argues that Roper took from her an airline ticket purchased by WSOC and gave it to his wife, which caused Boggess to purchase another ticket with her own money. (Doc. No. 98: Memorandum at 34-36). In support of her claim, Boggess cites her Complaint as evidence. (Doc. No. 98: Memorandum at 34; Exhibit 24).

Not only is this unsupported allegation in sufficient to defeat summary judgment, Celotex, 477 U.S. at 323, but Boggess's deposition testimony directly contradicts her previous sworn Complaint and her assertions in her subsequent Memorandum. She admitted that she did not pay for the ticket that she used and that Roper paid for his wife's ticket. (Doc. No. 61: Appendix at B, Boggess TR 255). Therefore, summary judgment is granted her meritless Ninth and Tenth Causes of Action because there is no genuine issue of material fact that Roper took her airline ticket or that Boggess was forced to use her own funds for business travel.

L.     Assault and Battery Claim

1.     Assault

In her Eleventh Cause of Action, Boggess claims that Roper intended to make her apprehensive of immediate harmful or offensive contact, and that she was in fact placed in apprehension of fear and imminent battery. (Doc. No. 81: Amended Complaint at ¶¶ 75-80). Relying on McCraken v. Sloan, 252 S.E.2d 250, 252 (N.C. Ct. App. 1979), she argues that "[t]he elements of assault are (1) reasonable apprehension (2) of harmful offensive contact." (Doc. No. 98: Memorandum at 45). In that case, the court compared assault claims against battery claims, but did not fully state the elements of either cause of action. Id. at 252. The court in Wilson v. Bellamy, 414 S.E.2d 347, 357 (N.C. Ct. App. 1992), recognized that Boggess's formulation is the "gist" of an action for assault, but stated the complete elements as: "intent, offer of injury, reasonable apprehension, apparent ability, and imminent threat of injury." (internal quotations and citations omitted).

Boggess testified she felt "uncomfortable" when Roper threw his headphones down and clapped his hands near her face, and that she "didn't like it" when he snapped his fingers at her. (Doc. No. 61: Appendix at B, Boggess TR 207-209). However, she said she took it as a threat and was afraid when Roper slammed his fist down in front of himself. (Doc. No. 61: Appendix at B, Boggess TR 233). Even if Boggess was reasonably placed in fear by Roper's actions, he is not liable for assault without proof of "the intent to cause apprehension of an imminent offensive or harmful contact without actually striking [her]." Britt v. Hayes, 541 S.E.2d 761, 762 (N.C. Ct. App. 2001). Boggess has provided no evidence creating a genuine issue of fact regarding that element of her claim. In a light most favorable to her, the evidence shows Roper's outbursts followed her poor performance or technical miscues on the show. Boggess testified that Roper would throw things or yell when he felt she had not followed his instructions. (Doc. No. 61: Appendix at B, Boggess TR 89). She described him slamming his hand and saying, "Damn it, Carrie, that's not what I told you to say." (Doc. No. 61: Appendix at B, Boggess TR 233). She also related one incident where he knocked over rack of cartridges with a chair after a traffic reporter was not ready as Roper expected. (Doc. No. 61: Appendix at B, Boggess TR 199-200). Roper allegedly said "I'm getting ready to blow" occasionally if things were really bad. (Doc. No. 61: Appendix at B, Boggess TR 228). None of these alleged incidents was coupled with a threat or attempt to harm Boggess physically. Therefore, the evidence fails to establish a material issue of the elements of assault, and summary judgment is granted on her claim that Roper intentionally caused her to fear imminent harmful or offensive contact.

2.      Battery Claim

Although her Eleventh Cause of Action is titled "Civil Assault," and she describes
Roper's "slapping her hand off the heater" as an assault  (Doc. No. 81: Amended Complaint at ¶
79), the Court is obligated to consider the merits of this claim as a battery. <u>Stanback v. Stanback</u>,
254 S.E.2d 611, 625 (N.C. 1979) (where complaint contains mislabeled claim, court should
consider correct legal theory for alleged facts).  An action for assault addresses an apprehension
of harmful or offensive contact, where an action for battery addresses "intentional and
unpermitted contacts with the plaintiff's person." <u>McCraken</u>, 252 S.E.2d at 252.

The elements of battery are intent, harmful or offensive contact, and causation. <u>Redding</u>
<u>v. Shelton's Harley Davidson, Inc.</u>, 534 S.E.2d 656, 659 (N.C. Ct. App. 2000).  A plaintiff is not
required to prove a defendant had a hostile intent in committing a battery, but that he had the
"intent to act, i.e. the intent to cause harmful or offensive contact . . . ." <u>Britt v. Hayes</u>, 541
S.E.2d at 762 (internal quotations and citations omitted; ellipses in original).  "A bodily contact
is offensive if it offends a reasonable sense of personal dignity." <u>Andrews v. Peters</u>, 330 S.E.2d
638, 641 (N.C. Ct. App. 1985) (quoting Restatement (Second) of Torts § 19 (1965)) (internal
quotations omitted); North Carolina Pattern Instructions Civil § 800.51 (2004).

Here, in a light most favorable to her, on January 22, 2004, Boggess turned on the heater
in the studio which made a bad smell. (Doc. No. 61: Appendix at B, Boggess TR 218, 225).  She
and another employee were laughing about the smell while Roper was on the air. (Doc. No. 61:
Appendix at B, Boggess TR 219-20).  Roper became angry and Boggess said that she would turn

the heater off while she was pouring a cup of coffee. (Doc. No. 61: Appendix at B, Boggess TR 221). Roper then said, "Quit fritzing with it. You never touch the heat. Do you understand me?" (Doc. No. 61: Appendix at B, Boggess TR 221-22). Roper allegedly came over to the thermostat where Boggess was trying to push "the down button" and "swatted [her] hand away from the heater." (Doc. No. 61: Appendix at B, Boggess TR 222). Boggess said she was not injured, but felt "embarrassed" and "uncomfortable." (Doc. No. 61: Appendix at B, Boggess TR 223). She reported the incident six days later to the human resources director. (Doc. No. 61: Appendix at B, Boggess TR 225).

Roper denies making any contact with Boggess, and is corroborated by the other people in the studio at that time. (Doc. No. 61: Appendix at A, Roper TR 85; at C, Palmer Affidavit at ¶ 6; at D, Laseter TR 23; at E, Canady TR 15). However, there is a genuine issue of this material fact because a reasonable jury could believe Boggess's account. Additionally, a reasonable jury could find the alleged contact "offensive," especially in conjunction with the verbal reprimand Boggess received in front of other employees.[8] See e.g. Snyder v. Tucker, 627 N.E.2d 1053, 1057 (Ohio Ct. App. 1993) (applying Restatement § 19 and affirming trial court's denial of summary judgment on battery claim where surgeon yelled critically at a nurse in front of others and grabbed her shoulder to draw her attention to the wound for which he needed the correct

_____

[8]This possibility does not affect the Court's determination above regarding the intentional infliction of emotional distress claim. Guthrie, 567 S.E.2d at 410 ("annoyingly juvenile, obnoxious, and offensive" behavior not extreme and outrageous); Johnson v. Bollinger, 356 S.E.2d 378, 382 (N.C. Ct. App. 1987) (conduct may be offensive without being extreme and outrageous); Snyder, 627 N.E.2d at 1056 (same).

instrument).  Therefore, summary judgment is denied on the battery claim against Roper individually in Boggess's Eleventh Cause of Action.[9]

Boggess seeks punitive damages for that claim. (Doc. No. 81: Amended Complaint at ¶ 80).  Such damages are not available unless a plaintiff shows "the presence of aggravating circumstances such as malicious, wanton and reckless injury." Hawkins v. Hawkins, 400 S.E.2d 472, 475 (N.C. Ct. App. 1991) (citing Worthy v. Knight, 187 S.E. 771 (N.C. 1936).  In the context of an intentional tort, such as battery, the aggravated conduct must be in addition to the tort. Ipock for Hill v. Gilmore, 354 S.E.2d 315, 319 (N.C. Ct. App. 1987).  Here, there is no proof aggravated circumstances beyond the allegedly offensive swatting of Boggess's hand.  The incident was brief, did not cause any physical injury, and others in the room did not even notice it.  Therefore, summary judgment is granted on her claim for punitive damages for battery in her Eleventh Cause of Action.

M.      Ratification Claim

Finally, in her Eighteenth Cause of Action styled as "Ratification," Boggess claims that the corporate defendants knew or should have known of Roper's hostile behavior from previous complaints, and that their failure to investigate or act caused her to suffer injury. (Doc. No. 81: Amended Complaint at ¶¶ 112-120).  Ratification is:

> the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account and may be inferred from failure to repudiate an unauthorized act . . . or from conduct . . . inconsistent with any other position than intent to adopt the act.

---

[9]Boggess has not alleged that the corporate defendants are liable for battery.

Guthrie v. Conroy, 567 S.E.2d 403, 411-12 (N.C. Ct. App. 2002) (internal quotations and citations omitted; ellipses in original). Thus, it must be shown that the employer had "full knowledge of all material facts" or had knowledge of facts which would lead a reasonable person to investigate further. Id. at 412.

Here, Boggess has not created a genuine issue showing WSOC's intention to ratify allegedly hostile actions by Roper. As discussed above, complaints about Roper by other employees were different from Boggess's allegations. (Doc. No. 61: Appendix at G, McIntyre TR 30-50 (summarizing various complaints); Doc. No. 98: Memorandum, Exhibit 7, Sexton TR 9 (disputing written reprimand); Exhibit 11, Hatfield Affidavit at ¶ 4 (accusing Roper of "unprofessional" conduct); Exhibit 13, Bateman TR 40 (describing Roper as "difficult to work with"); Exhibit 14, Boozer Affidavit at ¶¶ 3, 4 (former employee and rival disc jockey alleging assault at a concert); Exhibit 15, Luke Jensen Memo (regarding denial of sick leave and management style)). There is no evidence that Bateman reported Roper's alleged yelling, clapping his hands, and snapping his fingers at her. Boggess, herself did not report Roper's treatment of Bateman, nor any of the alleged incidents over the sixteen months that she claims caused her injuries, until the final "thermostat" episode. (Doc. No. 61: Appendix at B, Boggess TR 76, 214, 229, 263, 348). Even then, she refused to discuss that situation with McIntyre when she followed up on Boggess's complaint. (Doc. No. 61: Appendix at B, Boggess TR 390).

Thus, this case is markedly different from Guthrie, 567 S.E.2d at 412, where the victim-employee reported at least six incidents of harassing behavior and her employer did nothing.

Therefore, summary judgment is granted on Boggess's Eighteenth Cause of Action claiming ratification because there is no genuine issue that the corporate defendants had full knowledge of all material facts or those which would reasonably have caused them to investigate further.

## IV. CONCLUSION

Boggess has not produced sufficient evidence, in a light most favorable to her, to withstand the defendants' motions for summary judgment, except regarding her claim of battery against Roper.

**IT IS, THEREFORE, ORDERED** that

1. CBS Radio and Viacom's motion for summary judgment (Doc. No. 21) is **GRANTED**, and this matter is dismissed with prejudice in its entirety as to those parties.

2. The defendants' motions for summary judgment (Doc. No. 60 and 86) is **GRANTED** as to all causes of action in the Amended Complaint (Doc. No. 81), which are dismissed with prejudice, except as detailed below.

3. The defendants' motions for summary judgment (Doc. No. 60 and 86) are **DENIED** as to the claim for battery against Defendant Roper individually for actual and special damages based on his alleged non-consensual touching of Plaintiff Boggess on or about January 22, 2004, contained in the Eleventh Cause of Action of the Amended Complaint (Doc. No. 81).

Signed: September 1, 2006

Robert J. Conrad, Jr.
Chief United States District Judge